UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

KATHRYN DAY ALIANELL,

                         Plaintiff,

          v.

CAROLYN W. COLVIN,
COMMISSIONER OF SOCIAL SECURITY,

                         Defendant.

_____

                                  DECISION & ORDER

                                  14-CV-6655P

## PRELIMINARY STATEMENT

Plaintiff Kathryn Day Alianell ("Alianell") brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying her applications for Supplemental Security Income Benefits and Disability Insurance Benefits ("SSI/DIB"). Pursuant to 28 U.S.C. § 636(c), the parties have consented to the disposition of this case by a United States magistrate judge. (Docket # 12).

Currently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Docket ## 8, 10). For the reasons set forth below, I hereby vacate the decision of the Commissioner and remand this claim for further administrative proceedings consistent with this decision.

## BACKGROUND

### I.   Procedural Background

Alianell protectively filed for SSI/DIB on July 22, 2011, alleging disability

beginning on July 22, 2011, due to a hyperthyroidism, insomnia, mood disorder, morbid obesity,

high blood pressure, depression, sleep apnea, heartburn, lower back pain, knee and shoulder

problems, arthritis, and gastroesophageal reflux disease ("GERD").  (Tr. 151, 155).[1]  On

November 23, 2011, the Social Security Administration denied Alianell's claim for benefits,

finding that she was not disabled.  (Tr. 67).  Alianell requested and was granted a hearing before

Administrative Law John P. Costello (the "ALJ").  (Tr. 76-78, 90-113, 115-20).  The ALJ

conducted a hearing on February 20, 2013 in Rochester, New York.  (Tr. 37-59).  In a partially

favorable decision dated March 18, 2013, the ALJ found that Alianell was not disabled prior to

July 10, 2012 and was not entitled to benefits.  (Tr. 13-31).  The ALJ also found that beginning

on July 10, 2012, Alianell's age category changed, rendering her disabled as of that date.  (*Id.*).

On September 24, 2014, the Appeals Council denied Alianell's request for review

of the ALJ's decision.  (Tr. 1-6).  Alianell commenced this action on November 21, 2014 seeking

review of the Commissioner's decision.  (Docket # 1).


### II.   Relevant Medical Evidence[2]

#### A.   Treatment Records

##### 1.   Bariatrics of Western New York

Treatment notes indicate that Alianell received treatment at Bariatrics of Western

New York beginning in 2010.  (Tr. 375-78).  Alianell requested lap-band surgery and received

---

[1]  The administrative transcript shall be referred to as "Tr. __."

[2]  Those portions of the treatment records that are relevant to this decision are recounted herein.

counseling to lose weight prior to the surgery.  (*Id.*).  According to the treatment notes, Alianell

lost ninety-three pounds during the year prior to her surgery.  (Tr. 369).  On February 8, 2010,

Anthony DiBenedetto, MD, performed the surgery.  (*Id.*).  After the surgery, Alianell returned to

Bariatrics of Western New York for ongoing post-surgical monitoring.  (Tr. 374-406, 496-98).

####    2.    Russell P. Maggio, MD

On May 10, 2010, Alianell attended an appointment with Russell P. Maggio

("Maggio"), MD.  (Tr. 316-19).  Treatment notes indicate that Alianell had a medical history of

several physical impairments, including GERD, obesity, hypothyroidism, bilateral lower

extremity edema, chronic lower back pain, major depressive disorder, hypertension, restrictive

lung disorder, mood disorder, allergies, and sleep apnea.  (*Id.*).  Alianell had several previous

surgeries, including gall bladder surgery, lap-band surgery, bilateral foot surgery, bilateral carpal

tunnel release, bilateral knee surgery, and right achilles debridement.  (*Id.*).  During the

appointment, Alianell complained of increased knee pain, bilateral wrist pain, depression, and

anxiety.  (*Id.*).  Maggio's examination of Alianell demonstrated normal findings.  (*Id.*).

Maggio's diagnoses included hypothyroidism, lower extremity edema, obesity, hypertension,

status post gastric lap-band surgery, chronic lower back pain, Vitamin D and B 12 deficiencies,

major depressive disorder, obstructive sleep apnea, and osteoarthritis in her knees.  (*Id.*).  He

referred Alianell to Dr. Michael J. Klotz ("Klotz"), MD, at Red Creek Orthopaedics for her knee

pain.  (*Id.*).

Alianell returned on September 13, 2010 and met with Hillary McConnell

("McConnell"), RN, MS-FNP, complaining of continued bilateral knee pain and shoulder pain

for which hydrocodone offered no relief.  (Tr. 322-23).  Alianell also requested that her dosage

of Lisinopril be decreased to 10 milligrams.  (*Id.*).  Alianell reported that she was attempting to

lose weight, but that she experienced stressors in her home.  (*Id.*).  McConnell prescribed a trial of Ryzolt and instructed Alianell to see Dr. Klotz and to follow up in three months.  (*Id.*).

On December 3, 2010, Alianell returned for a follow-up appointment with McConnell.  (Tr. 324-25).  Alianell reported that she wanted to stop taking some of her medications and that the Ryzolt was providing relief for her knee pain, although she reported that the pain still prevented her from exercising.  (*Id.*).  McConnell advised Alianell to discontinue the Lisinopril and Prevacid and decreased her Atenolol dosage.  (*Id.*).  She encouraged Alianell to exercise.  (*Id.*).

On March 7, 2011, Alianell attended another appointment with McConnell.  (Tr. 326-27).  She complained of increased stressors, appetite, and aches and pains.  (*Id.*).  Alianell also reported poor sleep.  (*Id.*).  McConnell prescribed Gabapentin and advised Alianell to increase her exercise and to diet.  (*Id.*).

On August 12, 2011, Alianell returned for an appointment with McConnell.  (Tr. 330-31).  She complained of headaches and requested a Vicodin prescription refill.  (*Id.*).  Alianell reported that her husband and daughter caused her stress and that she was caring for her two grandchildren.  (*Id.*).  She reported no motivation, decreased sleep and headaches.  (*Id.*).  She reported that Tylenol provided relief.  (*Id.*).  McConnell discontinued her prescription for Gabapentin and prescribed Prozac and Trazadone.  (*Id.*).  She counseled Alianell about the risks of overuse of Vicodin.  (*Id.*).

Alianell returned for an appointment with McConnell on September 16, 2011.  (Tr. 332-33).  She reported that she was feeling a little better, had no suicidal ideations, and Trazadone helped her sleep.  (*Id.*).  McConnell continued Alianell's prescriptions and advised her to follow up in six months.  (*Id.*).  Alianell returned for an appointment with McConnell and

Maggio for a prescription refill on December 9, 2011.  (Tr. 334-35).  She reported feeling "ok," although she continued to be under significant stress at home because she was the primary caregiver for her two grandchildren, and her daughter was mentally ill and had been diagnosed with fibromyalgia.  (*Id.*).  Alianell reported feelings of depression and a lack of desire to leave her house.  (*Id.*).  She denied suicidal ideation, complained of joint pain, and requested an increase in her Vicodin dosage.  (*Id.*).  Alianell was prescribed Fluoxetine and Gabapentin and was again advised regarding Vicodin overuse.  (*Id.*).  She was told to follow up in two months or sooner if her symptoms increased.  (*Id.*).

On February 3, 2012, Alianell attended an appointment with Maggio and a nurse. (Tr. 450-51).  She requested a refill of her Vicodin prescription and a prescription for a new mattress.  (*Id.*).  Alianell reported that she continued to experience aches and pains, Vicodin did not provide extended relief, and she was not sleeping well.  (*Id.*).  She also requested that Maggio complete paperwork for her SSI/DIB application.  (*Id.*).  Maggio completed the requested paperwork and assessed that Alianell was suffering from myalgias, osteoarthritis, depression, anxiety, hypertension, hypothyroidism, and had a difficult family and marital situation.  (*Id.*).  He strongly encouraged her to seek psychiatric treatment and questioned whether she needed assistance at home.  (*Id.*).  He advised her to follow up in one month.  (*Id.*).

Alianell returned for an appointment with McConnell on March 16, 2012. (Tr. 454-55).  She reported a more stable mood, increased activity, and changed diet, and that she had gotten a new dog.  (*Id.*).  According to Alianell, she had attended an appointment with the doctor who had performed her gastric surgery and he had tightened the lap-band.  (*Id.*). McConnell advised her to diet and exercise and to return in four months.  (*Id.*).

On May 22, 2012, Alianell attended an appointment with Maggio.  (Tr. 456-59).

She complained of pain in her shoulder and neck and that her orthopedist had instructed her to

have someone evaluate her hips and back.  (*Id.*).  Maggio assessed that Alianell's hypertension,

hypothyroidism, and GERD were stable and that Alianell was not compliant with the CPAP

machine prescribed for her sleep apnea.  (*Id.*).  He assessed that she suffered from chronic lower

back pain, obesity, chronic osteoarthritis in her knees, chronic lower extremity edema, bilateral

hip pain, major mood disorder, seasonal allergies, and chronic polyps.  (*Id.*).  Upon examination,

Maggio assessed essentially normal findings, although Alianell continued to be morbidly obese.

(*Id.*).

Maggio ordered imaging of Alianell's cervical spine, which demonstrated mild to

moderate degenerative disc disease and facet arthropathy at L4 through S1, with moderate

degenerative disc disease at L2-3.  (Tr. 437).  The imaging also demonstrated an area of irregular

sclerosis with possible central lucency in the left iliac bone.  (*Id.*).  Further radiographs were

recommended.  (*Id.*).

Alianell returned for an appointment with McConnell on October 15, 2012.

(Tr. 460-61).  Alianell complained of pain throughout her body and was concerned that she

might be suffering from bone cancer.  (*Id.*).  She indicated that she had experienced aches for

years and wanted a comprehensive evaluation.  (*Id.*).  She also reported depression and the recent

loss of her brother, which was causing feelings of guilt.  (*Id.*).  She also requested a referral to

Dr. Poduri and reported that she had stopped taking her medication due to a loss of insurance.

(*Id.*).  McConnell ordered an echocardiogram and lab work.  (*Id.*).

On October 29, 2012, Alianell returned for an appointment with McConnell to

review her test results.  (Tr. 462-63).  Alianell reported improved mental health.  (*Id.*).  Alianell

returned for an appointment with McConnell on December 14, 2012.  (Tr. 464-65).  She reported

that Dr. Poduri had diagnosed her with fibromyalgia, prescribed Cymbalta, and advised her to

taper off her narcotics prescriptions.  (*Id.*).

On February 4, 2013, Alianell returned for an appointment with McConnell.

(Tr. 506-07).  She reported that she continued to see Dr. Poduri for treatment of her fibromyalgia

and complained of increased pain.  (*Id.*).  She reported that it takes her over one hour to wash

dishes due to pain.  (*Id.*).  She requested that paperwork be completed so that she could apply for

SSI benefits.  (*Id.*).  Treatment notes indicate that the requested paperwork was completed.  (*Id.*).

### 3.  Red Creek Orthopedics, P.C.

On May 25, 2010, Alianell's left knee was evaluated by Dr. Klotz upon referral

from Maggio.  (Tr. 214).  Alianell reported increasing left knee pain during the previous four

months.  (*Id.*).  According to Alianell, she had recently undergone lap-band surgery and had

commenced a walking program to assist with weight loss.  (*Id.*).  She reported issues with her left

knee in the past and that she had undergone bilateral knee arthroscopies.  (*Id.*).  She also reported

that her symptoms worsened with activity, particularly navigating stairs.  (*Id.*).  Images of her

knee revealed moderate degenerative changes, and Klotz assessed osteoarthritis of the left knee.

(*Id.*).  He administered a cortisone injection to her left knee and recommended a home exercise

program and that she follow up in one month.  (*Id.*).

### 4.  Orthopaedic Associates of Rochester, P.C.

On March 6, 2012, Alianell was evaluated by John E. Klibanoff ("Klibanoff"),

MD, at Orthopaedic Associates of Rochester, P.C., for complaints of right knee pain.

(Tr. 421-23).  Alianell reported that she had experienced increasing pain over the years which

now limited her ability to walk.  (*Id.*).  She reported no hip or groin pain and that she had

received an injection approximately one year ago that had alleviated her pain for approximately

two months.  (*Id.*).  Images of her knee demonstrated mild to moderate osteoarthritic disease.

(*Id.*).  Images of her pelvis demonstrated approximately 50% collapse of the right hip and

reasonable preservation of the left hip with minor osteoarthritic changes in her lumbar spine.

(*Id.*).  Upon examination, Alianell walked with a limp, was able to get on and off the

examination table without assistance, demonstrated full flexion and extension of the left knee,

limited flexion and extension of the right knee, good mobilization of the patellofemoral joint,

minor patellofemoral crepitation, tenderness on the medial knee, no instability, and excellent hip

flexion and rotation.  (*Id.*).  Klibanoff assessed degenerative changes in the patellofemoral joint

in both knees, with greater degeneration of the right knee.  (*Id.*).  He also assessed minor

degeneration in the hip and spine.  (*Id.*).  He recommended viscose supplementation and

continued weight loss.  (*Id.*).  On March 13, 2012, Klibanoff administered an injection to

Alianell's right knee and advised her to follow up in one month.  (*Id.*).

Alianell returned for an appointment with Klibanoff on April 17, 2012.

(Tr. 355-57).  Alianell reported that she continued to suffer severe, significant, and progressive

right knee pain despite the injection the previous month.  (*Id.*).  According to Alianell, she had

difficulty walking around the block or taking stairs, although she did not use her cane.  (*Id.*).

Alianell reported being able to drive and use an exercise bike.  (*Id.*).  Klibanoff recommended

obtaining an MRI of Alianell's knee due to her failure to respond to non-operative pain

management in order to assess surgery.  (*Id.*).

Alianell returned on April 25, 2012 to review the results of the MRI.

(Tr. 358-60).  She reported that the injection had not provided relief and that she continued to

experience increasing knee pain.  (*Id.*).  According to Alianell, she experienced diminished range

of motion and continued difficulty with prolonged activity.  (*Id.*).  Klibanoff reviewed the MRI

results, which demonstrated some degenerative changes, but no clinically relevant meniscus

tearing that would require surgery.  (*Id.*).  Klibanoff administered another injection to the right

knee and advised her to follow up in approximately five weeks.  (*Id.*).

On June 6, 2012, Alianell attended another appointment with Klibanoff.

(Tr. 361-62).  She reported improvement resulting from the previous steroid injection, including

range of motion and significantly diminished discomfort, although she continued to experience

some twinges of discomfort.  (*Id.*).  She reported attempting activity modifications and using her

cane for ambulation.  (*Id.*).  Klibanoff recommended that she continue to lose weight and use her

cane as needed.  (*Id.*).

### 5.      Rochester Immediate Care

On May 16, 2012, Alianell went to Rochester Immediate Care complaining of an

injury to her left pinky finger.  (Tr. 425-26).  According to Alianell, her finger had been pinched

in the chain of her dog's leash the previous evening.  (*Id.*).  She was prescribed Percocet and

Motrin and advised to follow up with Maggio.  (*Id.*).

### 6.      University of Rochester Physical Medicine and Rehabilitation

On December 10, 2012, Alianell attended an appointment with Kanakadurga Rao

Poduri ("Poduri"), MD, upon referral from Maggio.  (Tr. 445-48).  Alianell reported suffering

from pain throughout her body that was generally a level five out of ten, although sometimes a

level ten.  (*Id.*).  She reported pain in her head, neck, shoulders, elbows, hands, and back.  (*Id.*).

According to Alianell, she experienced severe stiffness in the morning that did not begin to abate

until the afternoon, and severe back and knee pain in the afternoon that prohibited functioning.

(*Id.*).  She also reported experiencing shooting pain from her head to her toes, as well as burning,

tingling, and numbness in her toes, legs and feet.  (*Id.*).  According to Alianell, although she had

experienced pain for fifteen years, it had gotten worse, possibly as a result of her increased

activity following gastric surgery.  (*Id.*).  Alianell reported several aggravating factors, including

standing, walking, exercising, driving, bending, lifting, twisting, stairs, weather changes, bright

lights, loud noises, cold temperatures, and stress.  (*Id.*).  She reported that she treated her pain

with Vicodin and rest.  (*Id.*).  According to Alianell, she had used a cane off and on for the

previous five years and had attempted steroid injections in her knees and shoulders with minimal

relief.  (*Id.*).

Alianell complained of disturbed sleep, but reportedly had not been using her

CPAP machine because the settings were incorrect.  (*Id.*).  She also reported waking during the

night due to pain in her elbows, shoulders, knees, and back.  (*Id.*).  Alianell slept in a hospital

bed due to her pain and her inability to turn during the night without the assistance of the rails.

(*Id.*).  Alianell reported that she attempted to clean her house during the day, but did not engage

in any other exercise.  (*Id.*).  She lived with her husband, adult children, and two grandchildren,

ages six and nine years.  (*Id.*).  She reportedly required assistance to complete household chores

due to her pain.  (*Id.*).

Upon examination, Poduri noted normal range of motion, normal extremities,

symmetric pulses, and normal gait with use of an assistive device.  (*Id.*).  Poduri assessed

multiple tender spots with approximately eleven out of eighteen areas of pain.  (*Id.*).  According

to Poduri, the tender spots, reported dependence on others, use of an assistive device, and

depression, with no other condition to explain her severe pain, was consistent with a diagnosis of

fibromyalgia.  (*Id.*).  Poduri noted that Alianell faced a long road to recovery, but expected that

her pain could be managed slowly with treatment.  (*Id.*).  She recommended that Alianell make

an appointment to correct her CPAP machine because adequate sleep was essential to her recovery.  (*Id.*).  She also discussed the importance of increased activity and weight loss, even if those efforts increased pain.  (*Id.*).

Alianell returned for an appointment with Poduri on December 24, 2012. (Tr. 480-95).  Poduri recommended that Alianell apply a heating pad three times a day for fifteen minutes.  (*Id.*).  She also recommended knee exercises and walking twice a day for fifteen minutes.  (*Id.*).  Poduri instructed Alianell to increase her walks to thirty minutes after one week and to return for further evaluation in February 2013.  (*Id.*).

     **B.**     **Medical Opinion Evidence**

          **1.**     **Karl Eurenius, MD**

On November 9, 2011, state examiner Karl Eurenius ("Eurenius"), MD, conducted a consultative internal medicine examination of Alianell.  (Tr. 279-87).  Alianell reported suffering from sleep apnea, depression, anxiety, stress, hypercholesterolemia, hypertension, obesity, rheumatoid arthritis, shortness of breath, and thyroid underfunction, although her blood pressure and asthma were well-controlled.  (*Id.*).  Alianell complained of pain in her back, shoulders, knees, and hands.  (*Id.*).  According to Alianell, her back pain was exacerbated by bending and lifting, her shoulder pain was exacerbated by lifting or elevating her arms, and her elbow pain was exacerbated by recurrent flexion and extension of her arms.  (*Id.*). Alianell reported that she cooked two times a week, cleaned the house and did the laundry once a week, and shopped once a month.  (*Id.*).  She reportedly showered once a week and dressed only to leave the house.  (*Id.*).  She reportedly enjoyed watching television, listening to the radio, sewing, and doing puzzles.  (*Id.*).

Upon examination, Eurenius noted that Alianell had a normal gait and did not appear to be in acute distress.  (*Id.*).  She was able to perform the heel and toe walk, although she experienced some back pain when standing on her toes.  (*Id.*).  Alianell's ability to squat was limited to one-quarter of full range due to pain in her low mid-back.  (*Id.*).  She used no assistive devices and had no difficulty getting on and off the exam table, changing for the exam, or rising from her chair.  (*Id.*).

Eurenius noted that Alianell's cervical spine showed full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally.  (*Id.*).  Eurenius found that Alianell's lumbar flexion was limited to sixty degrees with pain and tenderness in the low mid-back.  (*Id.*).  Her lateral flexion and rotation were full and without pain.  (*Id.*).  The straight leg raise was positive at thirty degrees bilaterally with pain in the low mid-back.  (*Id.*).  Eurenius found full range of motion in the shoulders, elbows, forearms, and wrists.  (*Id.*).  He also found full range of motion in the hips, knees, and ankles bilaterally, but noted some cool swelling in both knees without evidence of acute inflammation.  (*Id.*).  Eurenius assessed strength as five out of five in the upper and lower extremities and no evidence of sensory deficits.  (*Id.*).  Eurenius found Alianell's hand and finger dexterity to be intact and her grip strength to be five out of five bilaterally.  (*Id.*).  Eurenius also reviewed an x-ray of Alianell's lumbosacral spine that indicated degenerative changes at L2-L3, L4-L5, and L5-S1 with no compression fracture.  (*Id.*).  He also reviewed an x-ray of Alianell's left knee that demonstrated joint space narrowing.  (*Id.*).

Eurenius diagnosed Alianell with rheumatoid arthritis, based upon Alianell's report, hypothyroidism, hypertension, sleep apnea, depression, obesity, and asthma.  (*Id.*).  He opined that Alianell had limitations in exertional activities due to asthma.  (*Id.*).  He also assessed limitations for prolonged standing, walking, climbing or descending stairs due to

arthritis of the knees.  (*Id.*).  Eurenius also assessed limitations in lifting and carrying due to back pain secondary to arthritis and limitations in lifting heavy objects overhead due to arthritis in her shoulders.  (*Id.*).

### 2.     Christine Ransom, PhD

On October 28, 2011, state examiner Christine Ransom ("Ransom"), PhD, conducted a consultative psychiatric evaluation of Alianell.  (Tr. 273-76).  Alianell reported that she drove herself approximately thirty minutes to the examination.  (*Id.*).  Alianell also reported that she had completed high school in a regular educational setting and had worked with her husband, who is self-employed, until approximately six years ago.  (*Id.*).  She currently resided with her adult daughter and her two grandchildren, aged eight and five.  (*Id.*).

According to Alianell, she had never been hospitalized for mental health issues and had received mental health treatment from her primary care physician, who had prescribed medication to manage her depression and anxiety for the previous twenty-five years.  (*Id.*).  Alianell reported significant depression and anxiety, difficulty sleeping, normal appetite, frequent crying spells, irritability, low energy, an inability to persist at tasks due to poor concentration, and preoccupation with problems.  (*Id.*).  Alianell reported limited social activity and that she spent much of her day resting at home and watching television.  (*Id.*).  Alianell reported experiencing anxiety, but denied panic attacks, manic symptomatology, thought disorder, or cognitive symptoms or deficits.  (*Id.*).

Alianell reported that she was able to care for her personal hygiene and required assistance to complete household chores, including cooking, laundry, and shopping.  (*Id.*).  Alianell reported an inability to complete these tasks due to difficulty standing associated with her physical impairments.  (*Id.*).  Alianell reported that she was able to manage her money and to

drive, but that she rarely left her house.  (*Id.*).  According to Alianell, she spent her day sitting in front of the television and socializing with her immediate family.  (*Id.*).

Upon examination, Ransom noted that Alianell appeared casually dressed and adequately groomed.  (*Id.*).  Ransom opined that Alianell had slow and halting speech with clear, moderately dysphoric and tense voice, adequate language, coherent and goal-directed thought processes, somewhat moderately to markedly dysphoric and tense affect and mood, clear sensorium, full orientation, adequate insight, adequate judgment, and average intellectual functioning with an appropriate general fund of information.  (*Id.*).  Ransom noted that Alianell's attention and concentration were moderately impaired due to depression and anxiety.  (*Id.*).  According to Ransom, Alianell could count backwards and perform two out of three simple calculations, but had difficulty completing serial threes.  (*Id.*).  Alianell's immediate and recent memory skills were moderately impaired.  (*Id.*).  According to Ransom, Alianell could recall one out of three objects immediately, one out of three objects after five minutes, and could complete three digits forward and two digits backward.  (*Id.*).

According to Ransom, Alianell would have moderate difficulty following and understanding simple directions and instructions, performing simple tasks independently, maintaining attention and concentration for simple tasks, maintaining a simple regular schedule, and learning simple new tasks.  (*Id.*).  She would have moderate to marked difficulty performing complex tasks, relating adequately with others, and appropriately dealing with stress.  (*Id.*).  Ransom assessed that Alianell suffered from major depressive disorder, currently moderate to marked, and generalized anxiety, currently moderate to marked.  (*Id.*).  Ransom encouraged Alianell to seek mental health treatment and indicated that her prognosis would improve with more intensive treatment.  (*Id.*).

3.      **A. Hochberg, Psychology**

On November 21, 2011, agency medical consultant Dr. A. Hochberg

("Hochberg") completed a Psychiatric Review Technique.  (Tr. 291-304).  Hochberg concluded

that Alianell's mental impairments did not meet or equal a listed impairment.  (Tr. 291, 294).

According to Hochberg, Alianell suffered from mild limitations in her activities of daily living

and ability to maintain social functioning and moderate limitations in her ability to maintain

concentration, persistence or pace.  (Tr. 301).  According to Hochberg, there was insufficient

evidence to determine whether Alianell had suffered from repeated episodes of deterioration.

(*Id.*).  Hochberg completed a mental Residual Function Capacity ("RFC") assessment.

(Tr. 305-07).  Hochberg opined that Alianell suffered from moderate limitations in her ability to

understand, remember and carry out detailed instructions, maintain attention and concentration

for extended periods, complete a normal workday and workweek without interruptions from

psychologically-based symptoms and to perform at a consistent pace without an unreasonable

number and length of rest periods, and set realistic goals or make plans independently of others.

(Tr. 306).  According to Hochberg, Alianell had "mild to moderate limitations in function."

(Tr. 307).

4.      **Russell P. Maggio, MD**

On February 3, 2012, Maggio completed a physical RFC questionnaire.

(Tr. 346-50).  Maggio opined that Alianell suffered from hypertension, hypothyroidism,

osteoarthritis, obesity, depression, and sleep apnea, but her prognosis was good.  (*Id.*).

According to Maggio, Alianell experienced joint pain, low back pain, myalgias, depressed mood,

and anxiety.  (*Id.*).  Maggio reported that Alianell's subjective complaints were greater than his

objective findings, although he did not believe that she was a malingerer.  (*Id.*).  Rather, Alianell

suffered from psychological conditions that affected her physical conditions, including depression, somatoform disorder, and anxiety. (*Id.*). According to Maggio, Alianell's depression remained a significant issue, but she had not followed up with psychiatric treatment as recommended. (*Id.*). Maggio indicated that Alianell had gained thirty-six pounds since her gastric bypass surgery, which she attributed to stress from her family situation. (*Id.*).

According to Maggio, Alianell reported suffering from stress and pain that was sufficiently severe to interfere constantly with attention and concentration. (*Id.*). Maggio opined that Alianell could walk approximately three blocks before needing to rest, could sit for thirty minutes at a time, and could stand for approximately ten minutes at a time. (*Id.*). According to Maggio, Alianell reported that she was unable to stand or sit for any period of time. (*Id.*). Maggio indicated that Alianell would require periods of walking around during the workday, but suggested that an occupational and neutral physician should examine Alianell in order to determine her physical limitations. (*Id.*). Maggio indicated that Alianell required a sit/stand at will option and would often need to take unscheduled breaks during the workday. (*Id.*). According to Maggio, Alianell reported that she was unable to get up if she sat for too long and that she needed to elevate her legs when sitting. (*Id.*). Alianell also required the use of a cane to assist with ambulation. (*Id.*).

Maggio indicated that Alianell reported she was unable to carry any amount of weight, but strongly advised that she undergo an objective evaluation to measure her physical abilities. (*Id.*). Maggio also indicated that Alianell could occasionally look up and down, turn her head left and right, and could rarely hold her head in a static position. (*Id.*). He also indicated that she could occasionally twist and stoop, but could never crouch, squat, or climb ladders or stairs, and that she would have occasional limitations with reaching, handling, or

fingering. (*Id.*). According to Maggio, Alianell would experience good days and bad days and would likely be absent from work more than four days a month. (*Id.*). Additionally, Maggio indicated that Alianell had difficulty sleeping due to stress. (*Id.*). According to Maggio, Alianell was upset with her daughter because she was required to act as primary caregiver for her daughter's two children. (*Id.*). Alianell expressed a desire to obtain legal custody of her grandchildren so that she could receive their DSS benefits and indicated that she felt that her husband and her daughter did not assist. (*Id.*).

Maggio completed another physical RFC questionnaire one year later on February 4, 2013. (Tr. 500-04). Maggio opined that Alianell suffered from fibromyalgia, depression, osteoarthritis of the knees and hips, fatigue and obstructive sleep apnea, and that her prognosis was chronic. (*Id.*). According to Maggio, Alianell experienced chronic myofascial pain in her arms, shoulders, legs, knees, and hips. (*Id.*). Maggio reported that Alianell demonstrated tender points all over her body and described her pain as approximately five or six on a scale of one to ten. (*Id.*). He indicated that Alianell had recently begun to see Dr. Poduri and that she had not yet completed her maximum therapy. (*Id.*). He suggested that Poduri be contacted for additional information regarding her fibromyalgia. (*Id.*).

Maggio opined that Alianell's physical symptoms were affected by her depression. (*Id.*). According to Maggio, Alianell would frequently experience pain or other symptoms that would interfere with her attention and concentration to perform simple work tasks, but that she was capable of a low stress job. (*Id.*). He opined that she could sit, stand, and walk for less than two hours during an eight-hour workday. (*Id.*). Maggio indicated that Alianell required a sit/stand at will option and would need to take unscheduled breaks lasting fifteen minutes every hour of the workday. (*Id.*). Maggio opined that Alianell would not need to

elevate her legs when sitting and did not offer an opinion regarding Alianell's lifting and

carrying capabilities.  (*Id.*).  Maggio indicated that Alianell would occasionally require a cane to

assist with ambulation.  (*Id.*).

> Maggio opined that Alianell could occasionally look up and down, turn her head

left and right, and hold her head in a static position.  (*Id.*).  He also indicated that she could rarely

twist, crouch, squat, and climb ladders or stairs, and that she had no significant limitations with

reaching, handling, or fingering.  (*Id.*).  He opined that she could grasp and turn objects less than

fifty percent of the workday and could perform reaching tasks less than twenty percent of the

workday.  (*Id.*).  According to Maggio, Alianell would experience good days and bad days and

would likely be absent from work more than four days a month.  (*Id.*).

> Maggio again opined that Alianell's subjective complaints were not consistent

with his objective findings.  (*Id.*).  Maggio "strongly advised an [independent medical

examination] to determine her ability to work at gainful employment."  (*Id.*).

## III.    Non-Medical Evidence

> In her application for benefits, Alianell reported that she was born in 1957.

(Tr. 151).  Alianell reported that she had completed the twelfth grade and had previously been

employed at her husband's paving company.  (Tr. 155-57).  According to Alianell, she was last

employed in 2007 and stopped working because her husband retired.  (Tr. 155).

> Alianell reported that she did not care for any family members or pets, but was

able to care for her own personal hygiene without assistance and could prepare simple meals

approximately four times per week, although some days her pain prevented her from cooking.

(Tr. 163-64).  Alianell reported that she was able to complete household chores, including

cleaning and laundry, but needed assistance from her daughter and grandchildren.  (Tr. 165).

According to Alianell, she left home approximately two times per week and went grocery shopping with her daughter approximately once per month. (Tr. 165-66). Alianell was able to drive, but did not go out alone due to her fear of falling and inability to get up. (*Id.*).

Alianell reported that she enjoyed puzzles, watching television, and sewing, although the pain in her hands limited her sewing ability. (Tr. 166). Alianell only socialized with her immediate family and did not participate in any social activities on a regular basis. (Tr. 167). According to Alianell, her medical conditions limited her ability to lift, stand, walk, navigate stairs, kneel, squat, and reach overhead. (Tr. 168). Additionally, Alianell reported that she needed to elevate her feet when sitting. (*Id.*). Alianell reported using a cane prescribed by her doctor to assist with long distance walking or on uneven surfaces and reported using a motorized chair at the grocery store. (Tr. 169). She estimated that she could walk approximately one hundred feet before needing to rest for a few minutes. (*Id.*). In addition, Alianell reported difficulty paying attention, although she was typically able to finish tasks and to follow written and spoken instructions. (*Id.*). Alianell also reported difficulty with stress and memory, particularly on "bad" days. (*Id.*).

According to Alianell, she had suffered from sharp, stabbing and aching pain for the past twenty years in her shoulders, elbows, knees, hands, feet, lower back, and neck. (Tr. 170-71). Alianell reported that the pain was always present and was getting worse. (Tr. 171). According to Alianell, all activity exacerbated her pain. (*Id.*). Alianell took hydrocodone-acetaminophen, which reportedly provided relief for a few hours at a time. (*Id.*).

During the administrative hearing, Alianell testified that she had never worked, although she sometimes assisted her husband with his paving business. (Tr. 44). According to Alianell, if she was having a "good" day, she might help her husband with the business

accounting or by going to the bank.  (*Id.*).  Alianell reported that any income reflected in her

earnings records would have been from her husband's paving company.  (*Id.*).  According to

Alianell, she did not know whether her husband paid her a salary, although they filed their taxes

jointly and she believed that he had placed his business in her name in order to take advantage of

opportunities offered to women-owned businesses.  (Tr. 43, 45).  Alianell testified that although

the business was in her name, her husband actually ran the business and performed all of the

work.  (Tr. 45-46).

Alianell testified that she was unable to work because of rheumatoid arthritis,

which caused constant pain throughout her entire body, including her hips, back, arms, and

joints.  (Tr. 47).  According to Alianell, the pain was generally a level six of ten, and although

she took hydrocodone to manage the pain, it provided little relief.  (Tr. 48).  Alianell reported

that she was able to lift only approximately five pounds and could stand for only approximately

five minutes before needing to sit.  (Tr. 49).  According to Alianell, she could sit for

approximately forty-five minutes before needing to change positions and could walk for only

approximately five minutes at a time, although her doctor had instructed her to attempt to walk

approximately fifteen minutes at a time.  (Tr. 50).  Alianell also reported that several of her

doctors had recommended that she use a cane, which she did because of a risk that her knees

would buckle.  (*Id.*).

According to Alianell, her blood pressure and thyroid functioning were controlled

with medication.  (Tr. 52).  She also reported difficulty sleeping, despite use of a CPAP machine.

(*Id.*).  Alianell attributed her sleep difficulties to chronic pain.  (*Id.*).  Alianell testified that she

also suffered from mental impairments characterized by crying spells and becoming easily upset.

(Tr. 53).  According to Alianell, she received treatment for these conditions from Maggio, who prescribed Trazadone to assist with sleep.  (*Id.*).

Alianell testified that she lived with her adult son and daughter, both of whom are disabled.  (Tr. 43).  She enjoyed watching her grandchildren play outside, and sometimes attempted to sew, although the pain in her hands prevented her from frequent sewing. (Tr. 53-54).  Alianell testified that she could do laundry with her grandchildren's assistance and was able to prepare simple meals approximately twice per week.  (Tr. 54).  She reported that she often needed assistance or breaks when vacuuming and mopping and needed breaks when doing the dishes.  (Tr. 55).

Vocational Expert Julie Andrews ("Andrews") also testified during the hearing. (Tr. 56-58).  The ALJ first indicated to Andrews that he found that Alianell had no past relevant work.  (Tr. 57).  The ALJ then asked Andrews whether a person would be able to perform any positions in the national economy who was the same age as Alianell, had the same education and vocational profile, and could perform the full range of light work, but was limited to simple tasks and occasional interaction with coworkers, supervisors, and the general public.  (*Id.*).  Andrews responded that such an individual could perform the positions of housekeeper/cleaner and small products assembly.  (*Id.*).

## DISCUSSION

## I.   Standard of Review

This Court's scope of review is limited to whether the Commissioner's determination is supported by substantial evidence in the record and whether the Commissioner applied the correct legal standards.  *See Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004)

("[i]n reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision"), *reh'g granted in part and denied in part*, 416 F.3d 101 (2d Cir. 2005); *see also Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) ("it is not our function to determine *de novo* whether plaintiff is disabled[;] . . . [r]ather, we must determine whether the Commissioner's conclusions are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard") (internal citation and quotation omitted).  Pursuant to 42 U.S.C. § 405(g), a district court reviewing the Commissioner's determination to deny disability benefits is directed to accept the Commissioner's findings of fact unless they are not supported by "substantial evidence."  *See* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive").  Substantial evidence is defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation omitted).

   To determine whether substantial evidence exists in the record, the court must consider the record as a whole, examining the evidence submitted by both sides, "because an analysis of the substantiality of the evidence must also include that which detracts from its weight."  *Williams ex rel Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).  To the extent they are supported by substantial evidence, the Commissioner's findings of fact must be sustained "even where substantial evidence may support the claimant's position and despite the fact that the [c]ourt, had it heard the evidence *de novo*, might have found otherwise."  *Matejka v. Barnhart*, 386 F. Supp. 2d 198, 204 (W.D.N.Y. 2005) (citing *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983)).

A person is disabled for the purposes of SSI and disability benefits if they are unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A).  When assessing whether a claimant is disabled, the ALJ must employ a five-step sequential analysis.  *See Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (*per curiam*).  The five steps are:

> (1)    whether the claimant is currently engaged in substantial gainful activity;
>
> (2)    if not, whether the claimant has any "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities";
>
> (3)    if so, whether any of the claimant's severe impairments meets or equals one of the impairments listed in Appendix 1 of Subpart P of Part 404 of the relevant regulations;
>
> (4)    if not, whether despite the claimant's severe impairments, the claimant retains the residual functional capacity to perform his past work; and
>
> (5)    if not, whether the claimant retains the residual functional capacity to perform any other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) & 416.920(a)(4)(i)-(v); *Berry v. Schweiker*, 675 F.2d at 467. "The claimant bears the burden of proving his or her case at steps one through four[;] . . . [a]t step five the burden shifts to the Commissioner to 'show there is other gainful work in the national economy [which] the claimant could perform.'"  *Butts v. Barnhart*, 388 F.3d at 383 (quoting *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998)).

A.    **The ALJ's Decision**

In his decision, the ALJ followed the required five-step analysis for evaluating

disability claims.  (Tr. 17-31).  Under step one of the process, the ALJ found that Alianell had

not engaged in substantial gainful activity since the alleged onset date.  (Tr. 19).  At step two, the

ALJ concluded that Alianell had the severe impairments of fibromyalgia/arthritis, obesity, sleep

apnea, and depression.  (*Id.*).  At step three, the ALJ determined that Alianell did not have an

impairment (or combination of impairments) that meets or medically equals one of the listed

impairments.  (Tr. 20).  With respect to Alianell's mental limitations, the ALJ concluded that she

had mild restrictions in activities of daily living and moderate difficulties in maintaining social

functioning and concentration, persistence or pace.  (*Id.*).  The ALJ concluded that since July 22,

2011, Alianell had the RFC to perform less than the full range of light work because she was

capable of lifting/carrying and pushing/pulling twenty pounds occasionally and ten pounds

frequently and could stand or walk for six hours during an eight-hour workday, but was limited

to performing simple tasks with only occasional interaction with coworkers, supervisors, and the

general public.  (Tr. 20-29).  At steps four and five, the ALJ determined that prior to July 10,

2012, Alianell did not have any relevant past work, but that other jobs existed in the national and

regional economy that Alianell could perform, including the positions of housekeeper/cleaner

and small products assembly I.  (Tr. 30).  Accordingly, the ALJ found that Alianell was not

disabled prior to July 10, 2012.  (*Id.*).  The ALJ further concluded that on July 10, 2012,

Alianell's age category changed, rendering her disabled pursuant to application of the Medical

Vocational Guidelines (the "Grid"), specifically Grid Rule 202.04, 20 C.F.R. Part 404, Subpart

P, Appendix 2, on that date.  (Tr. 30-31).

B.      **Alianell's Contentions**

Alianell contends that the ALJ's determination that she was not disabled prior to July 10, 2012 is not supported by substantial evidence and was the product of legal error. (Docket # 8-1).  First, with respect to the ALJ's physical RFC assessment, Alianell contends that it is flawed because it is not supported by any medical opinion of record.  (*Id.* at 20-23).  With respect to the ALJ's mental RFC assessment, Alianell contends that it is flawed because it failed to adequately account for limitations assessed by Ransom.  (*Id.* at 24-25).  Alianell also challenges the ALJ's credibility determination contending that it was based upon misstatements of the record and failed to fully account for Alianell's fibromyalgia diagnosis.  (*Id.* at  25-30).

II.      **Analysis**

Alianell challenges the ALJ's physical RFC determination on the grounds that the ALJ formulated it without the benefit of any medical opinion of record and without making clear how he did so.  (Docket # 8-1 at 20-23).  Alianell further contends that even if the ALJ did rely upon Eurenius's opinion, he failed to adequately explain how that opinion supported his RFC findings.  (*Id.*).  According to Alianell, several of the limitations assessed by Eurenius, including limitations in prolonged standing and walking, are inconsistent with the ALJ's conclusion that she could perform the requirements of light work.  (*Id.*).  The government disagrees, maintaining that the RFC is supported by Eurenius's opinion, as well as other substantial evidence in the record.  (Docket # 10-1 at 19-22).

Despite the ALJ's lengthy discussion of Eurenius's opinion, I cannot determine whether and, if so, the extent to which the ALJ relied upon Eurenius's opinion in formulating his

RFC.  I agree with Alianell that remand is warranted in the absence of any other medical opinion in the record supporting a light work finding.

An individual's RFC is her "maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis." *Melville v. Apfel,* 198 F.3d 45, 52 (2d Cir.1999) (quoting SSR 96–8p, 1996 WL 374184, *2 (July 2, 1996)).  When making an RFC assessment, the ALJ should consider "a claimant's physical abilities, mental abilities, symptomology, including pain and other limitations which could interfere with work activities on a regular and continuing basis." *Pardee v. Astrue*, 631 F. Supp. 2d 200, 221 (N.D.N.Y. 2009) (citing 20 C.F.R. § 404.1545(a)).  "To determine RFC, the ALJ must consider all the relevant evidence, including medical opinions and facts, physical and mental abilities, non-severe impairments, and [claimant's] subjective evidence of symptoms." *Stanton v. Astrue*, 2009 WL 1940539, *9 (N.D.N.Y. 2009) (citing 20 C.F.R. §§ 404.1545(b)-(e)), *aff'd*, 370 F. App'x 231 (2d Cir. 2010).

"[A]n ALJ is not qualified to assess a claimant's RFC on the basis of bare medical findings, and as a result an ALJ's determination of RFC without a medical advisor's assessment is not supported by substantial evidence." *Dailey v. Astrue*, 2010 WL 4703599, *11 (W.D.N.Y.) (internal quotation omitted), *report and recommendation adopted*, 2010 WL 4703591 (W.D.N.Y. 2010).  Accordingly, although the RFC determination is an issue reserved for the Commissioner, "[w]here the medical findings in the record merely diagnose [the] claimant's exertional impairments and do not relate those diagnoses to specific residual functional capabilities," the Commissioner generally "may not make the connection himself." *Deskin v. Comm'r of Soc. Sec.*, 605 F. Supp. 2d 908, 912 (N.D. Ohio 2008) (internal quotation omitted).

In his decision, the ALJ thoroughly discussed Eurenius's opinion and specifically noted that Eurenuis assessed that Alianell had limitations for prolonged standing, walking, lifting/carrying, above-the-head activity, climbing/descending stairs, and engaging in exertional activities. (Tr. 26). Additionally, the ALJ recognized that Eurenius did not clearly articulate the degree of limitation for each of these activities, noting that the opinion was "vague in terms of the level of limitation." (*Id.*). Nevertheless, because Eurenius had conducted a thorough physical examination that demonstrated "minimal abnormal objective findings," the ALJ gave the opinion "some weight" and determined that it, along with other record evidence demonstrating minimal objective findings, supported a finding that Alianell could perform light work. (*Id.*).

I agree with Alianell that the ALJ failed to articulate how his physical RFC findings were supported by Eurenius's opinion. As noted, Eurenius's failed to identify the degree of limitation in several categories of functioning, including standing, walking, lifting, and carrying – all of which an employee needs to be able to perform frequently for light work. That failure, coupled with the fact that the presence of minimal objective findings may be explained by Alianell's later diagnosis of fibromyalgia, appears to call into question the ALJ's decision to accord "some weight" to Eurenius's opinion while at the same time determining that she could perform light work.

A consultative examiner's use of imprecise phrases to define an individual's limitations will not necessarily render his opinion impermissibly vague, particularly where the opinion is "based on clinical findings and an examination of the claimant" that support the conclusion reached by the examiner. *Rosenbauer v. Astrue*, 2014 WL 4187210, *16 (W.D.N.Y. 2014). In this case, however, although Eurenius conducted a thorough examination of Alianell,

27

his minimal objective findings may be explained by the later diagnosis of fibromyalgia, a disease that can present without significant objective findings. *See Green-Younger v. Barnhart*, 335 F.3d 99, 108 (2d Cir. 2003) ("a growing number of courts, including our own, . . . have recognized that fibromyalgia is a disabling impairment and that 'there are no objective tests which can conclusively confirm the disease'") (quoting *Preston v. Sec. of Health & Human Servs.*, 854 F.2d 815, 818 (6th Cir. 1988)); *Davidow v. Astrue*, 2009 WL 2876202, *4 (W.D.N.Y. 2009) ("objective findings in cases involving fibromyalgia and similar disorders may be minimal").

In addition, the limitations assessed by Eurenuis concern categories of functioning that are essential to light work. Light work requires approximately six hours of standing and/or walking during an eight-hour workday and requires frequent lifting or carrying of objects weighing ten pounds. 20 C.F.R. §§ 404.1567(b), 416.967(b); *Rosas-Nazario v. Colvin*, 2015 WL 5104548, *4 (W.D.N.Y. 2015) (light work "requires 'standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday'") (quoting *Napierala v. Astrue*, 2009 WL 4892319, *6 (W.D.N.Y. 2009)). Frequent means occurring from one-third to two-thirds of the workday. *See* S.S.R. 83-10, 1983 WL 31251, *5-6 (1983). As discussed above, Eurenuis concluded that Alianell was limited in prolonged standing and walking and in lifting and carrying.

Some courts, including this Court, have held that "an opinion assessing moderate limitations for sitting, standing and walking [is not necessarily] inconsistent with a determination that [a] claimant can perform the requirements of light or medium work," while other courts have held that "moderate or severe limitations in prolonged walking are inconsistent with full range light or medium work." *See Harrington v. Colvin*, 2015 WL 790756, *14 (W.D.N.Y. 2015)

(collecting cases).  In *Harrington*, this Court concluded that an opinion assessing limitations for prolonged standing and walking was not inconsistent with the ALJ's conclusion in that case that the plaintiff could perform light work because substantial evidence existed in the record supporting that conclusion.  *Id.* at *15-16.  As the Court noted in *Harrington*, record evidence included treatment records indicating improvement, minimal objective findings, and daily activities (including working as a security guard, maintaining the lawn, performing household chores, riding a motorcycle, and hunting) consistent with light work.  *Id.*

By contrast, substantial record evidence does not exist in this case to support the conclusion that claimant is able to perform the requirements of light work despite the assessed limitations in her ability stand, walk, carry, and lift.  First, the record does not demonstrate significant symptomatic improvement; rather, the record demonstrates that Alianell has suffered from chronic pain over several years and that she was recently diagnosed with fibromyalgia. Further, the record does not suggest that Alianell participates in activities of daily living that are consistent with light work.  Although the ALJ characterized Alianell as the primary caretaker for her "two toddler grandchildren" and noted that she was able to "cook, clean, shop, do laundry, with minimal assistance," both characterizations appear to overstate her activities.  The record demonstrates that her grandchildren were not "toddlers" at the time of the ALJ's decision. Treatment records suggest that Alianell's grandchildren were six and nine years old in December 2012.  (Tr. 445).  Additionally, although Alianell reported that she tried to assist with household chores, preparing meals and shopping, nothing in the record suggests that she was able to complete these tasks with only "minimal" assistance.  Rather, the record suggests that Alianell received substantial assistance and required rest breaks.  Considering this evidence, I cannot

conclude that Alianell's walking, standing, lifting, and carrying limitations are clearly consistent with a conclusion that she is able to perform the exertional requirements of light work.

In other words, it is not clear that the limitations assessed by Eurenius support the ALJ's conclusion that Alianell can perform the exertional requirements of light work.  Under these circumstances, the ALJ had a duty to articulate clearly (1) whether he was relying upon Eurenius's opinion of her limitations concerning functional activities essential to light work and, if so, how they supported the ALJ's conclusion that Alianell could perform light work; or, (2) if not, whether and how other medical opinion evidence supported the ALJ's findings.  The ALJ did not satisfy that obligation, and this Court thus cannot conclude that the ALJ's determination is supported by substantial evidence.  *See Cestare v. Colvin*, 2016 WL 836082, *4 (W.D.N.Y. 2016) (remanding where ALJ's RFC was formulated without articulated reliance on any medical opinion of record).

On remand, the ALJ must articulate whether and how he finds that the limitations assessed by Eurenius support his RFC conclusion and, if not, he must identify whether and how other evidence in the record supports his RFC findings.  Given Alianell's subsequent fibromyalgia diagnosis, the ALJ should consider obtaining an opinion from her diagnosing physician, Poduri, or an updated consulting opinion.

Alianell also challenges the ALJ's mental RFC assessment on the grounds that the ALJ failed to account for the limitations assessed by Ransom.  (Docket # 8-1 at 24-25).  Unlike the ALJ's physical RFC assessment, the ALJ's conclusion that Alianell is able to perform simple, unskilled work requiring limited interaction with others appears to be well-supported by the record.  Little evidence in the record suggests Alianell suffers from mental impairments that would interfere with her ability to perform simple, unskilled work, and Alianell has not sought

mental health treatment, despite her primary care physician's recommendation that she do so. Further, the medical opinions of record assess generally mild to moderate limitations arising from Alianell's mental impairments.  That said, Ransom's opinion that Alianell suffers from moderate limitations in understanding simple directions and instructions and performing simple tasks independently does appear inconsistent with the ALJ's conclusion that she is unlimited in her ability to perform simple, unskilled work.  On remand, the ALJ should clarify his opinion to address Ransom's limitations and articulate whether they are consistent with his RFC findings; if not, he should explain his basis for rejecting them.  In light of my determination that remand is otherwise warranted, I decline to reach Alianell's remaining challenge concerning the ALJ's credibility analysis.  *See Cestare v. Colvin*, 2016 WL 836082 at *4.

## CONCLUSION

For the reasons stated above, the Commissioner's motion for judgment on the pleadings (**Docket # 10**) is **DENIED**, and Alianell's motion for judgment on the pleadings (**Docket # 8**) is **GRANTED** to the extent that the Commissioner's decision is reversed, and this case is remanded to the Commissioner pursuant to 42 U.S.C. § 405(g), sentence four, for further administrative proceedings consistent with this decision.

**IT IS SO ORDERED.**

*s/Marian W. Payson*
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
       March 15, 2016